Robert ZEMAN, Respondent,

v.

CITY OF MINNEAPOLIS, et al., Petitioners, Appellants.

No. CX–95–429.

Supreme Court of Minnesota.

Aug. 22, 1996.

Kenneth Hertz, Hertz and Associates, St. Anthony, David P. Frank, Bemidji, for respondent.

Surell Brady, Minneapolis City Attorney, James A. Moore, Caroline Bachun, Assistant City Attorneys, Minneapolis, for appellants.

## OPINION

GARDEBRING, Justice.

In this case we must determine if the actions of the City of Minneapolis revoking respondent Robert Zeman's rental dwelling license constituted a temporary taking for which the United States and Minnesota Constitutions require compensation.

Pursuant to a city ordinance, the Minneapolis City Council revoked Zeman's license for failing to adequately address "disorderly uses"[1] of his rental property, namely drug

---

1. A disorderly use is defined as a violation, on the licensed premises, of any of the following:
   (1) *Minnesota Statutes, Sections 609.75 through 609.76, which prohibit gambling;*
   (2) *Minnesota Statutes, Sections 609.321 through 609.324, which prohibits prostitution and acts relating thereto;*
   (3) *Minnesota Statutes, Sections 152.01 through 152.025, and Section 152.027, Subdi-* visions 1 and 2, which prohibit the unlawful sale or possession of controlled substances;
   (4) *Minnesota Statutes, Section 340A.401, which prohibits the unlawful sale of alcoholic beverages;*
   (5) *Section 385.110 of this Code, which prohibits noisy assemblies;*
   (6) *Minnesota Statutes, Sections 97B.021, 97B.045, 609.66 through 609.67 and 624.712*

deals and associated violence. Zeman brought this action seeking, in part, reinstatement of his license and, some 20 months after the city revoked it, the trial court ordered the license reinstated, concluding that the city had acted precipitously: the ordinance requires three instances of "disorderly use" involving occupants of the dwelling before a rental dwelling license may be revoked and the two of the three instances cited by the city did not involve occupants of respondent's rental property. On the related takings question, the trial court determined no taking had occurred. The court of appeals remanded the case to the trial court for new analysis, concluding the trial court had employed a mistaken legal standard. The city appealed and we reverse.

Since 1975 Zeman has owned a multi-unit residential building located in Minneapolis and has been licensed to operate the building as rental property. The city maintains rental licensure requirements to ensure that operators of rental property comply with the housing code, which establishes basic minimum standards for the buildings and their operation, in order to protect public health, safety and welfare. Minneapolis, Minn., Code of Ordinances § 244.2020 (1995).

In 1991 the Minneapolis City Council amended the housing code to include a provision requiring rental licensees to respond to activities on their properties that require police intervention. The new ordinance provided that "[i]t shall be the responsibility of the licensee to take appropriate action, with the assistance of * * * the Minneapolis Police Department, following conduct by tenants and/or their guests on the licensed premises which is determined to be disorderly, in violation of any of [several listed statutes and ordinances] to prevent further violations." *Id.* § 244.2020.

The police department's community services bureau, which is responsible for the enforcement of the provision, is empowered to determine that disorderly conduct, as described above, occurred at a licensed premise. Once it makes such a determination, the bureau will notify the licensee by mail and direct that appropriate action be taken to remedy the problem. *Id.* § 244.2020(c). If another instance of such conduct occurs within twelve months, the bureau will again notify the licensee by mail and require a written report of the actions taken or proposed. *Id.* § 244.2020(d). If yet another instance occurs within twelve months, the licensee's rental dwelling license may be denied, revoked, suspended or not renewed. *Id.* § 244.2020(e).

Zeman received his first notice of disorderly use for the property on June 30, 1992. In response to the notice, he met with an officer from the community services bureau. On March 12, 1993, he received a second notice; he responded with a letter indicating that he maintained a policy of evicting problem tenants. He received a third notice of disorderly use on April 21, 1993, which included an advisory notice that the community services bureau was recommending that the City Council revoke Zeman's rental dwelling license.

Zeman appealed this recommendation to the Rental Dwelling License Board of Appeals. The Board concluded that three instances of disorderly conduct, as defined in section 244.2020, occurred at the property, that Zeman failed to take appropriate action, and that his license should be revoked. Subsequently, the Minneapolis City Council voted to revoke his license.

Zeman initiated this lawsuit against the City of Minneapolis seeking reinstatement of the rental dwelling license, compensation for the alleged taking of his license, and other claims that are not before us today. The trial court, observing that section 244.2020 specifically applies to disorderly conduct by persons "occupying" the rental premises and

through 624.716, and section 393.40, 393.50, 393.70, 393.80, 393.90, and 393.150 of this Code, which prohibit the unlawful possession, transportation, sale or use of a weapon; or (7) Minnesota Statutes, Sections 609.72 and Section 385.90 of this Code, which prohibit disorderly conduct, when the violation disturbs

the peace and quiet of the occupants of at least two (2) units on the licensed premises or other premises, other than the unit occupied by the person(s) committing the violation.
Minneapolis Housing Maintenance Code § 244.2020(a).

that two of the three instances of disorderly use upon which the revocation was based did not involve occupants of the rental premises, determined that the revocation of Zeman's license was in error and ordered his license be reinstated.

On the takings issue, the trial court heard testimony from Zeman's expert witness, a real estate appraiser, on whether or not the temporary revocation constituted a taking. The appraiser testified that he had visited the property, reviewed the applicable zoning restrictions, and checked on sales of similar lots in the neighborhood. He said that the building and lot were presently worth about "negative $20,000 to $25,000" at sale. Given that rezoning for commercial or industrial use was unlikely, the witness noted that the only possible use was residential. Under questioning by the court, the witness stated that the economic value of the property as it sat was "very close to zero," largely due to the economically depressed nature of the neighborhood. According to the appraiser, it was unlikely that a buyer would purchase, as a start-up venture, a rental property in such a neighborhood; the property was only profitable because Zeman already owned it. Thus, under Zeman's theory, the revocation eliminated the only economically viable use for the property and effected a regulatory taking. *See Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1019, 112 S.Ct. 2886, 2895, 120 L.Ed.2d 798 (1992).

The trial court ruled that Zeman had failed to establish a takings claim viable under either the federal or Minnesota Constitutions and granted partial summary judgment in favor of the city. According to the trial court, Zeman's witness "fail[ed] to establish that [Zeman] has been deprived of all economically viable uses of his property." In addition, Zeman did not demonstrate to the court that no alternative use for this property existed. The court observed that evidence of the diminution of market value to which Zeman's expert testified was insufficient to establish a total deprivation. Zeman had offered no testimony as to the existence of alternative uses for the property. Also, despite the lack of any impediment to his doing so, Zeman had not reapplied for a new li-

cense. The trial court observed that Zeman's ability to sell the property had not been impaired, as a new owner would have to apply for a new license in any event. *See* Minneapolis Code of Ordinances § 244.1900. Therefore, the trial court concluded that Zeman's claim was actually a tort claim—that is, simply a claim for recompense for the unlawful revocation of his license, not for the taking of his property—and that Zeman was simply attempting to get around the city's statutory immunity, which would likely bar recovery.

Zeman sought review by the court of appeals, which reversed. The court of appeals observed that the trial court had analyzed this case under the rule of *Lucas,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798, which held that regulation that denies all economically beneficial or productive use of land is a taking. *Id.* at 1019, 112 S.Ct. at 2895. However, the court of appeals decided the proper analysis was that described by the Supreme Court in *Penn Central Transp. Co. v. City of New York,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978), and utilized by the court of appeals in *Woodbury Place Partners v. City of Woodbury,* 492 N.W.2d 258 (Minn.App.1992), *pet for rev. denied* (Minn. Jan 15, 1993), *cert. denied* 508 U.S. 960, 113 S.Ct. 2929, 124 L.Ed.2d 679 (1993). Determining that this case was analogous to *Woodbury Place,* the court of appeals remanded to the trial court for consideration of the factors described in the *Penn Central* analysis. *Zeman v. City of Minneapolis,* 540 N.W.2d 532, 536 (Minn.App.1995).

The question before us today is whether the revocation of Zeman's rental dwelling license constituted a taking within the meaning of the United States and Minnesota Constitutions. As the trial court's rulings resulted, essentially, in summary judgment in favor of the city, on appeal we must inquire whether there remain any genuine issues of material fact and whether the lower court erred in its application of the law. *State by Cooper v. French,* 460 N.W.2d 2, 4 (Minn. 1990).

■ The city revoked Zeman's license by means of a regulatory ordinance, but did not physically appropriate Zeman's land. The

Takings Clause of the Fifth Amendment and the similar provision in the Minnesota Constitution[2] ensure that the government cannot force "some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960). Thus, to determine an answer to the question confronting us today, we must attempt the unenviable task of sorting through the complex law of takings. *See San Antonio River Auth. v. Garrett Bros.,* 528 S.W.2d 266, 273 (Tex.Civ.App.1975) (labeling takings law a "crazy-quilt pattern of judicial doctrine").

Modern regulatory takings law stems from the nebulous notion that when the exercise of state police power regulation of private property "goes too far" it will amount to a taking. *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922). Unfortunately, the law does not become clearer with later cases. In general, it can be said that no firmly established test exists for determining when a taking has occurred, instead takings law turns largely on the particular facts underlying each case. *See Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659.

On these facts, the factors listed in *Penn Central* and the themes drawn from past takings cases, especially the line of cases involving regulations designed to prevent harm to the public, beginning with *Mugler v.*

*Kansas,* 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887), appear to provide the best analytic framework.[3] Under *Penn Central,* a court considering a takings claim must review 1) the economic impact of the regulation on the person(s) suffering the loss, 2) the extent to which the regulation interferes with distinct investment backed expectations, and 3) the character of the government action to assess whether the complained of action effected a taking of private property for public use. *Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 225, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986) (quoting *Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659). The third factor closely parallels a *Mugler*-based analysis.

The crux of this case is the degree of impact that the city's attempt to fulfill its police power objective has upon Zeman's ability to put his property to some economically beneficial use. The appellant city argues that its exercise of police power to prevent nuisances, such as the criminal conduct in Zeman's apartment building, is proper and that its actions should not give rise to a taking unless its regulation results in the total deprivation of all economically beneficial uses of the property. *See Lucas,* 505 U.S. at 1019, 112 S.Ct. at 2895. For his part, Zeman makes much of the fact that the city misapplied its own ordinance—and was therefore effectively operating outside the boundaries of its laws—but generally supports the court

**2.** U.S. Const., amend. V (guaranteeing that no "private property be taken for public use without just compensation"); Minn. Const. art. I, § 13 ("[p]rivate property shall not be taken, destroyed or damaged for public use without just compensation").

**3.** Scholars seem to agree that *Penn Central* provides the best formulation of the factors the Supreme Court deems important to takings analyses. John E. Nowak and Ronald D. Rotunda, *Constitutional Law* 463 (5th ed.1995); *see* Frank I. Michelman, *Property, Utility, and Fairness: Commentaries on the Ethical Foundations of "Just Compensation" Law,* 80 Harv. L.Rev. 1165, 1184 (1967).

However, analysis of takings cases often relies heavily on reasoning by analogy to previous takings cases. The most relevant line of takings cases to the issue before us today involves regulations designed to prevent harm to the public and

protect life and property from noxious activities. In *Mugler,* the progenitor of this line of cases, the Court held that a state statute preventing the manufacture of beer was not a taking of a beer maker's property. Writing for the Court, Justice Harlan noted that depreciation, perhaps extreme, in the value of the beer manufacturer's buildings and machinery was likely, but that the state nevertheless possessed the power to regulate alcohol for the protection of the health, morals, and safety of the public. *Mugler,* 123 U.S. at 661–62, 8 S.Ct. at 297. The Court rejected Mugler's argument that the state's regulation had amounted to a taking without just compensation. Since *Mugler,* the Court has kept alive this brand of noncompensable takings. Generally, the regulation must directly ameliorate the noxious activity emanating from the private lands at issue. *See Lucas,* 505 U.S. at 1025–26 & n. 12, 112 S.Ct. at 2898–99 & n. 12; *Nollan v. California Coastal Comm'n,* 483 U.S. 825, 841, 107 S.Ct. 3141, 3150–51, 97 L.Ed.2d 677 (1987).

of appeals decision to remand the case to the trial court.

■ Our takings analysis must begin with the fact that Zeman's license, which was reinstated by the trial court, was thus taken, if at all, only temporarily. However, this will have no impact upon our analysis. The United States Supreme Court has held that temporary takings, even those later invalidated by courts, are not different from permanent takings. *First English Evangelical Lutheran Church v. County of Los Angeles,* 482 U.S. 304, 321, 107 S.Ct. 2378, 2389, 96 L.Ed.2d 250 (1987). A property owner whose property has been taken by government regulation may maintain an action, such as the instant one, in inverse condemnation. *Id.* at 315, 107 S.Ct. at 2385–86.

■ We turn, then, to the *Penn Central* factors described above.[4] Under this analysis, a general property regulation will not result in a taking "unless the property owner demonstrates that the regulation has resulted in a severe economic loss to the property owner and that the government action is not rationally related to any legitimate governmental interest. However, the Court has provided no clear guidelines for lower courts when they examine the nature of the harm caused to the property owner in such cases * * *." Nowak and Rotunda, *Constitutional Law, supra,* at 464. We must scrutinize the economic impact of the regulation on the property owner and the extent to which the regulation interferes with the property own-

er's investment-backed expectations as well as consider the nature of the regulation.

■ The city argues that the ordinance at issue here is a valid exercise of municipal power to ameliorate a nuisance, namely criminal activity in a residential neighborhood. Zeman does not challenge this characterization, but points to the fact that the city erroneously employed its own ordinance. This seems to us to be irrelevant: if the ordinance indeed is a proper effort to protect the health, morals, or safety of the community which has the effect of prohibiting a particular use of a property, then there will be no taking. *See Mugler,* 123 U.S. at 661–62, 8 S.Ct. at 297.

The first two of the *Penn Central* factors involve the economic impact of the regulation on the person suffering the loss and the extent to which the regulation interferes with distinct investment backed expectations. *Penn Central,* 438 U.S. at 124–25, 98 S.Ct. at 2659–60. Certainly, as Zeman's witness testified, the economic impact on Zeman has been substantial; the best use for his property is as an apartment building, and without a rental dwelling license he cannot operate it as such. Moreover, rezoning of the property for another use is unlikely and, given the economically depressed nature of the neighborhood, so too would be locating a buyer. Also, as Zeman has operated this property as a rental dwelling since acquiring it in 1975, it would appear that he has some investment-backed expectations in its use as such. Thus,

---

4. A *per se* exception to the general approach exists, where the regulation deprives the property owner of *all* economically viable uses of his or her property. On such facts, the Court will find a taking. *See, e.g., Lucas,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798. In the instant case, we determine that the *Lucas* rule does not apply.

To determine the applicability of the *Lucas* rule, we must examine Zeman's reasonable investment-backed expectations as to what use he has put his property. *Lucas,* 505 U.S. at 1027–31, 112 S.Ct. at 2899–2901. The trial court concluded that Zeman's witness, who testified that Zeman's property had no value without the rental license, was not persuasive. The trial court determined that Zeman's witness did not establish that Zeman had been deprived by the city's action of any economically viable use for his property. Rather, the trial court viewed the

testimony as "indicat[ing] that the market value of [Zeman's] property has been adversely affected by the license revocation." Moreover, Zeman did not demonstrate to the court that no alternative use for this property existed. The trial court correctly observed that, if an alternative use is available, even if it is not the best or most profitable use, the regulation has caused merely a decline in the property's value, not the denial of all economically beneficial use; as the trial court noted, a decline in value is insufficient to bring this case within the ambit of *Lucas. See Lucas,* 505 U.S. at 1019, 1030, 112 S.Ct. at 2895, 2901.

It was for the trial court to listen to Zeman's witness and credit that testimony accordingly; this court will not set aside the trial court's findings unless they are clearly erroneous. Minn. R. Civ. P. 52.01. We are not convinced that is the case here.

the first two *Penn Central* factors militate towards a decision in Zeman's favor.

▇ Consideration of the third factor, the character of the government action, however, favors the city. Under this factor, we must examine the regulation at issue, with emphasis on its purpose and the possibility of achieving that purpose with this regulation. While this is always an important consideration in a takings analysis, in cases involving a regulation aimed at the protection of the public health and safety, it becomes paramount. If the state regulation appears genuinely designed to prevent harm to the public and is likely to achieve that goal and the harm suffered by the property owner does not appear to be one that should be borne by the entire community, we will not find a taking. *See, e.g., Mugler,* 123 U.S. at 661–62, 8 S.Ct. at 297; *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 488–93, 107 S.Ct. 1232, 1243–46, 94 L.Ed.2d 472 (1987).

*Mugler* held that a state could prohibit a use of a property that it determined to be injurious to community health, morals, or safety and, therefore, although enforcement of a statute prohibiting the manufacture of alcohol against Mugler, a beer maker, would substantially depreciate the value of his property, no taking occurred. *Mugler,* 123 U.S. at 656–57, 668–69, 8 S.Ct. at 295, 300–01. Since *Mugler,* the Court has upheld as valid state regulatory efforts—denying compensation for alleged takings—the destruction of infected trees jeopardizing local orchards, *Miller v. Schoene,* 276 U.S. 272, 279–80, 48 S.Ct. 246, 247–48, 72 L.Ed. 568 (1928), the banning of brickyard plant operations in urban areas, *Hadacheck v. Sebastian,* 239 U.S. 394, 410–11, 36 S.Ct. 143, 145–46, 60 L.Ed. 348 (1915), and strict limitations on coal mining activities, *Keystone,* 480 U.S. at 485, 107 S.Ct. at 1241–42.

▇ A harm-prevention regulation, if not a ruse for a state purpose other than protecting the public from noxious harm or illegal activity, is a powerful rationale militating against finding a taking. *See* Bruce W. Burton, *Regulatory Takings and the Shape of Things to Come: Harbingers of a Takings Clause Reconstellation,* 72 Ore. L.Rev. 603,

618–19 (1993). A reviewing court must look to the nature of the regulation with an eye on its purpose and the probability of achieving that purpose with *this* regulation. If the regulation is drawn to prevent harm to the public, broadly defined, and seems able to achieve this goal, then a taking has not occurred. *See, e.g., Keystone,* 480 U.S. at 488–93, 107 S.Ct. at 1243–46.

The city's decision to engage landlords and the police department in a cooperative effort to protect residential neighborhoods was well within its publicly-bestowed power and mandate. Protection of the public has long been recognized to carry some individual burdens, including the regulatory prohibition of certain uses of private property. Indeed, as Professor Burton points out, government regulation directed towards harm prevention has been the "preeminent theory by which the state has traditionally been able to avoid" paying compensation. Burton, *Regulatory Takings, supra,* at 617–18. This ordinance, viewed in light of the city's intent in passing it, seems to us to be just such a harm-prevention regulation.

This ordinance is designed to serve a legitimate public interest, deterring criminal activity in residential neighborhoods, by enlisting the aid of landlords. The ordinance is written to foster cooperation between landlords and the police department's community services bureau to work towards a solution. *See* Minneapolis Code of Ordinances § 244.2020. As the city points out, all of the conduct specified in the ordinance is criminalized by the state of Minnesota. Further, the responsibilities ascribed to landlords do not appear to be severe and may, we think, be properly deemed incidental to operating rental dwellings in an urban area. Where landlords do not cooperate under the terms of the ordinance, they contribute to the continuation of illegal activity in their buildings. In the face of such action, the city is well justified in revoking their licenses.

▇ As the *Keystone* Court explained,

[O]ne of the State's primary ways of preserving the public weal is restricting the uses individuals can make of their property. While each of us is burdened some-

what by such restrictions, we, in turn, benefit greatly from the restrictions that are placed on others. These restrictions are "properly treated as part of the burden of common citizenship."

*Keystone*, 480 U.S. at 491, 107 S.Ct. at 1245 (citations omitted) (quoting *Kimball Laundry Co. v. United States*, 338 U.S. 1, 5, 69 S.Ct. 1434, 1437, 93 L.Ed. 1765 (1949)). The instant ordinance seems to us to fall into the same category: it serves a public harm prevention purpose and, properly implemented, it will likely be advantageous to all involved. Accordingly, we see no taking here.

Reversed.