Leon S. DeCOOK, et al., Respondents,

v.

**ROCHESTER INTERNATIONAL AIRPORT JOINT ZONING BOARD, Appellant.**

No. A09–969.

Supreme Court of Minnesota.

March 30, 2011.

---

Bradley J. Gunn, Howard A. Roston, Malkerson Gunn Martin, L.L.P., Minneapolis, Minnesota, for respondents.

Clifford M. Greene, John M. Baker, Monte A. Mills, Greene Espel P.L.L.P, Minneapolis, Minnesota, for appellant.

Susan L. Naughton, St. Paul, Minnesota, for amicus curiae League of Minnesota Cities.

Aaron D. Van Oort, Melina K. Williams, Faegre & Benson L.L.P., Minneapolis, Minnesota, for amicus curiae Metropolitan Airports Commission.

Lori Swanson, Attorney General, Erik M. Johnson, Assistant Attorney General, for amicus curiae State of Minnesota Commissioner of Transportation.

Lee A. Henderson, Hessian & McKasy, P.A., Minneapolis, Minnesota, for amici curiae Gordon D. Galarneau and Penny S. Galarneau.

Wm. Christopher Penwell, Anthony J. Gleekel, Mark Thieroff, Siegel, Brill, Greupner, Duffy & Foster, P.A., Minneapolis, Minnesota, for amici curiae Hampton K. O'Neill, Kelley McC. O'Neill, and James W. O'Neill.

## OPINION

ANDERSON, G. BARRY, Justice.

This case arises from an airport zoning ordinance enacted in 2002 by appellant Rochester International Airport Joint Zoning Board. The ordinance increased the size of a runway safety zone that extended over property owned by respondents Leon S. and Judith M. DeCook. The ordinance also changed the restrictions within the safety zone to allow fewer land uses on the DeCooks' property and other land within

the zone. The DeCooks alleged in an inverse-condemnation action that the Board's decision constituted a taking or damaging of private property for public use for which the DeCooks must be compensated. After trial, a jury found that the 2002 ordinance diminished the value of the DeCooks' land by $170,000. The district court concluded that the diminution of value determined by the jury did not constitute a taking as a matter of law and entered judgment in favor of the Board. The DeCooks appealed, and the court of appeals reversed. The Board appealed. We affirm the court of appeals and remand to the district court to enter judgment in favor of the DeCooks.

The DeCooks purchased 240 acres of land north of the Rochester International Airport for $159,600 in 1989. Approximately 19 acres of the land purchased by the DeCooks was subject to land-use regulations defined by Safety Zone A, the most restrictive safety zone established by ordinance in 1982 by the Board.[1] Soon after buying the land, the DeCooks developed Oak Summit Golf Course. The DeCooks operated the golf course throughout the period at issue here, but the course is not subject to Safety Zone A. The 1982 ordinance, identified as Ordinance No. 3, applied Safety Zone A to the approach areas that radiated from the end of the airport's runways. At the time the DeCooks purchased their 240 acres, Ordinance No. 3 allowed land within Safety Zone A to be used for agriculture and for commercial or industrial sites, so long as those commercial or industrial sites were at least 20 acres in size. Ordinance No. 3 prohibited dwellings within Safety Zone A, and also prohibited a range of specific uses such as churches, trailer courts, campgrounds, and any use that brought more than 10 people to any one acre or more than 50 people to a commercial or industrial site.

On September 18, 2002, the Board enacted Ordinance No. 4, the ordinance at issue in this case. Ordinance No. 4 changed the land-use regulations within Safety Zone A so that fewer uses were allowed than previously permitted under Ordinance No. 3. For example, although Ordinance No. 4 continued to prohibit dwellings within Safety Zone A, it also prohibited all "buildings, temporary structures, exposed transmission lines, or other

---

1. In 1945, the Legislature granted to local governments and joint airport zoning boards the authority to adopt and enforce zoning regulations near airports and established a process for the State to review and approve local airport regulations. Act of Apr. 16, 1945, ch. 303, §§ 26–27, 1945 Minn. Laws 534, 567–69 (codified as amended at Minn. Stat. ch. 360 (2010)). Before a local body may adopt zoning regulations, it must submit its proposed ordinance to the Minnesota Commissioner of Transportation, who reviews the proposal to ensure that the local safety regulations satisfy minimum standards set by the Commissioner. See Minn.Stat. § 360.065, subd. 2. The local body may not enact its proposed ordinance without the approval of the Commissioner. Id.

The State standards include three land use safety zones for the area surrounding an airport. See Minn. R. 8800.2400 (2009). Safety Zone A is the most restrictive zone and is currently defined to apply to a fan-shaped area extending from the end of a runway for a distance equal to two-thirds of the length of the runway. Id., subps. 5, 6(B). In Zone A, the State standards prohibit buildings and allow only uses such as agriculture, certain outdoor recreation, and automobile parking. Id., subp. 6(B). Safety Zone B, the next most restrictive zone, extends from the end of Safety Zone A for a distance equal to one-third of the length of the runway. Id., subps. 5, 6(C). Buildings are allowed in Safety Zone B, subject to restrictions on density, plot size, and height. Id. subp. 6(C). Safety Zone C, the least restrictive zone in the current standards, surrounds an airport and includes general restrictions on uses that may interfere with communications and other flight operations. Id., subps. 5, 6(A), (D).

similar above-ground land use structural hazards." Permissible land uses within Safety Zone A under Ordinance No. 4 included "agriculture (seasonal crops)[,] horticulture, animal husbandry, raising of livestock, wildlife habitat, lighted outdoor recreation (non-spectator), cemeteries, and automobile parking," and those uses that "will not create, attract, or bring together an assembly of persons thereon." The Board also increased the size of Safety Zone A. For the DeCook property, that meant a total of 47 acres was within Safety Zone A as defined by Ordinance No. 4— the 19 acres previously located within Safety Zone A as defined by Ordinance No. 3 and an additional 28 acres.

Most of the DeCook property is outside Safety Zone A. The western 160 acres of the DeCooks' 240–acre parcel is zoned by Olmsted County as "RC," in which recreational and commercial uses are allowed. The eastern 80 acres of the DeCook parcel is zoned by the City of Rochester as "M1," in which commercial and light industrial development is allowed. The M1 zoning underlies all of the property subject to Safety Zone A under Ordinance No. 4. Oak Summit Golf Course stretches across the RC land and part of the M1 land.

The DeCooks commenced this action in 2005. The DeCook complaint alleged that Ordinance No. 4 was "designed to specifically benefit a public or governmental enterprise," caused "a substantial and measurable decline" in the market value of the DeCooks' property, and constituted "a constitutional compensable taking under the principles of *McShane v. City of Faribault*," 292 N.W.2d 253, 258–59 (Minn. 1980). In *McShane*, we resolved a regulatory takings claim brought by the owner of land subject to runway safety-zone regulations near the Faribault Municipal Airport. We held that "where land use regulations, such as the airport zoning ordinance here,

are designed to benefit a specific public or governmental enterprise, there must be compensation to landowners whose property has suffered a substantial and measurable decline in market value as a result of the regulations." 292 N.W.2d at 258–59.

The district court granted the Board's motion for summary judgment, and the DeCooks appealed. *DeCook v. Rochester Int'l Airport Joint Zoning Bd.* (*DeCook I*), No. A06–2170, 2007 WL 2178046, at *1 (Minn.App. July 31, 2007), *rev. denied* (Minn. Oct. 24, 2007). The court of appeals held that, as in *McShane*, the De-Cooks "must be compensated if their property has suffered a substantial and measurable decline in market value as a result of [Ordinance No. 4]." *Id.* at *3. The court held that whether a diminution in value occurred, and the extent of any diminution, were questions of fact, while the question of "whether the diminution is substantial" was a question of law. *Id.* at *4. The court rejected the district court's conclusion that we would reach a different decision in this case than we did when we considered the "strikingly similar" facts of *McShane* in 1980. *Id.* at *3. The court also cited a footnote to our decision in *Wensmann Realty, Inc. v. City of Eagan*, 734 N.W.2d 623 (Minn.2007), in which we said we did not consider *McShane* to be " 'different from or inconsistent with the flexible approach to takings' " adopted by the U.S. Supreme Court in cases interpreting the Takings Clause of the U.S. Constitution. *DeCook I*, 2007 WL 2178046, at *3 n. 2 (quoting *Wensmann*, 734 N.W.2d at 641 n. 14). The court of appeals reversed, *id.* at *1, 5, and we denied review.

On remand, the case went to trial in November 2008. The parties disputed the development potential of the DeCooks' property subject to Safety Zone A given the physical features of the land. The

Board's appraiser set the value of the diminution caused by Ordinance No. 4 at $110,000, and the Board asked the jury to return a verdict of no more than that amount. The DeCooks' appraiser set the diminution caused by Ordinance No. 4 at $425,000. The DeCooks asked the jury to return a verdict for that amount, or for an amount between $110,000 and $425,000. On November 6, 2008, the jury, by special verdict, found Ordinance No. 4 diminished the value of the DeCooks' property by $170,000.

The district court then decided the diminution found by the jury did not constitute a compensable taking as a matter of law. The court rejected the DeCooks' argument that *McShane* created a "different and unique test" for takings claims in Minnesota. Rather, the court applied and balanced the factors established by the Supreme Court in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978): the economic impact of the regulation on the claimant; the extent to which the regulation interfered with distinct investment-backed expectations; and the character of the governmental action. The court relied upon *Wensmann* in adopting this approach, noting that our footnote discussing *McShane* stated that "[a]ny unfairly unequal distribution of the regulatory burden may be considered in appropriate cases under the character factor of the *Penn Central* approach and then balanced along with the other relevant factors." *Wensmann*, 734 N.W.2d at 641 n. 14. The court found each *Penn Central* factor weighed against the DeCooks. In its discussion of the economic-impact factor, the court compared the $170,000 diminution with both the $2.77 million value of the land set by the Board's appraiser and with Leon DeCook's testimony that his property had a before-damage value of $4.8 million and

held that the economic impact of a decrease in value of either 3.5% or 6.14% (depending on the starting value) was "minimal." In its discussion of the character of the government action, the court cited *McShane* and concluded the DeCooks had not suffered "a substantial decline" as a result of the ordinance, in part because the ordinance did not affect the "primary use" of the DeCook property. The court concluded that the DeCooks had not met their burden of proving the lost value "was a substantial decrease that is manifestly unfair to require them to sustain," and held that there was no taking as a matter of law.

The DeCooks appealed. In a divided decision, the court of appeals reversed and remanded for judgment in favor of the DeCooks. *DeCook v. Rochester Int'l Airport Joint Zoning Bd.* (*DeCook II*), No. A09–969, 2010 WL 1850268, at *5 (Minn. App. May 11, 2010). The majority held that *McShane* was the law of the case under *DeCook I* and rejected the Board's argument that, under *Wensmann*, *McShane* was "merely ... instructive in considering the character factor under *Penn Central*." *DeCook II*, 2010 WL 1850268, at *4. The majority concluded that the $170,000 diminution resulted from the unequal burden that Safety Zone A placed on the DeCooks' property. *Id.* at *5. The dissent stated that the majority erred by not measuring the amount of diminution against the overall value of the property before damage and agreed with the district court's decision that the proportional diminution is "'minimal' and 'does not significantly interfere with the DeCooks' legitimate property interests.'" *Id.* at *6 (Johnson, J., dissenting). The Board sought review, which we granted.

The parties in this appeal do not dispute the question of fact resolved by the jury: that Ordinance No. 4 caused a $170,000

decrease in the value of the DeCooks' property. The parties disagree over what law we should apply to that fact in order to resolve this dispute. The DeCooks ask us to interpret and apply the Takings Clause in the Minnesota Constitution rather than the Takings Clause in the U.S. Constitution. The DeCooks argue that, in Minnesota, *McShane* controls regulatory takings claims arising from airport safety-zone ordinances.[2] The Board contends the flexible *Penn Central* analysis controls the outcome of this case, regardless of whether the case is analyzed under the state or federal constitution. We turn first to the question of which analysis controls.

### A.

■ The Minnesota Constitution provides that "[p]rivate property shall not be taken, destroyed or damaged for public use without just compensation." Minn. Const. art. I, § 13. The language of the Minnesota Constitution is broader than the Takings Clause of the Fifth Amendment to the U.S. Constitution: "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V; *State by Humphrey v. Strom*, 493 N.W.2d 554, 558 (Minn.1992) (describing the Minnesota takings provision as "broader than the language of the federal constitution"). In limited circumstances, government regulation of private property may result in a taking even though the government has not directly appropriated nor physically invaded the property. *See Wensmann*, 734 N.W.2d at 632 (citing *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 414–15, 43 S.Ct. 158, 67 L.Ed. 322 (1922)). Whether a governmental entity's action constitutes a regulatory taking is a question of law that we review de novo. *Wensmann*, 734 N.W.2d at 631; *Alevizos v. Metro. Airports Comm'n (Alevizos I )*, 298 Minn. 471, 484, 216 N.W.2d 651, 660–61 (Minn.1974).

■ When we evaluate whether a government regulation of private property is a taking, our task is to determine whether " 'justice and fairness require that the economic injuries caused by public action be compensated by the government.' " *Wensmann*, 734 N.W.2d at 632 (quoting *Palazzolo v. Rhode Island*, 533 U.S. 606, 633, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001)). Our inquiry must be " 'highly fact-specific, depending on the particular circumstances underlying each case.' " *Id.* (quoting *Westling v. Cnty. of Mille Lacs*, 581 N.W.2d 815, 823 (Minn.1998)). Our analysis "relies heavily on reasoning by analogy to previous takings cases," *Zeman v. City of Minneapolis*, 552 N.W.2d 548, 552 n. 3 (Minn. 1996), and we rely upon our cases interpreting and analyzing the Minnesota Constitution when property owners have sought compensation under its provisions.

We have often applied *Penn Central* to decide a regulatory takings case under the Minnesota Constitution. *See, e.g., Wensmann*, 734 N.W.2d at 633; *Zeman*, 552 N.W.2d at 552 & n. 3. *Penn Central* did not establish any set formula for deciding whether a taking occurred. The Court indicated, however, that the inquiry should include the economic impact of the regulation on the claimant, the extent to which the regulation interferes with distinct investment-backed expectations, and the character of the government action. *Penn Cent.*, 438 U.S. at 124, 98 S.Ct. 2646. But *Penn Central* is not the only test. For

---

2. The DeCooks also argue that *McShane* controls under the doctrine of the law of the case because of the court of appeals decision in *DeCook I*. The doctrine of the law of the case is discretionary and does not bar us from reviewing an earlier decision of the court of appeals. *Peterson v. BASF Corp.*, 675 N.W.2d 57, 66 (Minn.2004). We elect not to apply the doctrine in this case but will instead resolve whether *McShane* controls as a matter of law.

example, in *Johnson v. City of Minneapolis*, 667 N.W.2d 109, 115–17 (Minn. 2003), we declined to apply *Penn Central* to a takings claim because we decided the property owners were entitled to compensation under the Minnesota Constitution—regardless of the outcome under *Penn Central.* But we did apply *Penn Central* in *Wensmann,* 734 N.W.2d at 633–42, in part because the property owner did not argue that the case required us to interpret the Minnesota Constitution differently than the U.S. Constitution. *Id.* at 632 n. 5, 633.

Here, the DeCooks ask us to interpret and apply the Minnesota Constitution differently than the U.S. Constitution. In doing so, we are necessarily guided by our earlier, and seminal, airport zoning decision, *McShane.* In the end, we conclude *McShane* controls the result here.

The McShanes initiated an inverse-condemnation action against the City of Faribault, Rice County, and the Faribault–Rice County Joint Airport Zoning Board after the Board enacted an ordinance that applied a Safety Zone A and a Safety Zone B to land that the McShanes owned near the Faribault Municipal Airport. *McShane,* 292 N.W.2d at 255. The ordinance prohibited above-ground structures in Safety Zone A and "[i]t [was] undisputed that commercial development [in Zone A] would

be out of the question." *Id.* Less-restrictive regulations applied within Safety Zone B, which covered an approach area farther from the runway than Safety Zone A. *Id.* at 256. The parties' experts disagreed on the extent to which the ordinance decreased the value of the McShanes' property but agreed the diminution was "substantial." [3] *Id.*

In *McShane,* we drew a distinction between zoning regulations such as those that implement comprehensive land-use plans, under which "a reciprocal benefit and burden accru[es] to all landowners from the planned and orderly development of land use," and zoning regulations enacted "for the sole benefit of a governmental enterprise," such as the Faribault airport. *Id.* at 257–58. We referred to the former as "arbitration" regulations and gave as an example regulations that implement a comprehensive land-use plan. *Id.* at 258. For the latter—which we called "enterprise" regulations—we held that "where land use regulations, such as the airport zoning ordinance here, are designed to benefit a specific public or governmental enterprise, there must be compensation to landowners whose property has suffered a substantial and measurable decline in market value as a result of the regulations." *Id.* at 258–59.[4]

3. The landowners' expert set the total loss at $360,000, or 67% of the $522,000 value "when put to its highest and best use, commercial development." *McShane,* 292 N.W.2d at 256. The defendants' experts valued the Zone A loss at 50% of the initial value and the Zone B loss at 9.3%. *Id.*

4. We cited *Penn Central* as support for the distinction we made in *McShane* between "arbitration" and "enterprise" regulations. 292 N.W.2d at 258. We did not directly cite a particular page of *Penn Central,* but *Penn Central* does support our conclusion in *McShane.*

    *Penn Central* dealt with New York City's denial of a request from the owners of Grand

Central Terminal to build a 55–story office tower over the landmark building. *See Penn Cent.,* 438 U.S. at 117–18, 98 S.Ct. 2646. The Supreme Court distinguished between that case and *United States v. Causby,* "in which government, *acting in an enterprise capacity,* has appropriated part of [private] property for some strictly governmental purpose." *Penn Cent.,* 438 U.S. at 135, 98 S.Ct. 2646 (emphasis added) (citing *United States v. Causby,* 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946)). The appropriation in *Causby* was of the airspace above a chicken farm by low-flying bombers and other military aircraft landing on a nearby runway. *Causby,* 328 U.S. at 258–59, 66 S.Ct. 1062. The taking

We did not expressly hold in *McShane* that the test we announced there, for takings claims stemming from airport ordinances establishing runway safety zones, applied when relief is sought under the broader language of the Minnesota Constitution. But a review of the *McShane* briefs to this court, and the precedent upon which we relied, make clear that the *McShane* test applies when relief is sought under the Minnesota Constitution in airport zoning cases. For example, in *McShane*, we relied on *Alevizos I*, a case in which we held noise pollution from aircraft flights could amount to a taking under the Minnesota Constitution:

> Every landowner must continue to endure that level of inconvenience, discomfort, and loss of peace and quiet which can be reasonably anticipated by any average member of a vibrant and progressive society. But when those interferences reach the point where they cause a measurable decrease in property market value, it is reasonable to assume that, considering the permanency of the air flights, a property right has been, if not 'taken or destroyed,' at the very

least 'damaged,' for which our constitution requires that compensation be paid.

*Alevizos I*, 298 Minn. at 486–87, 216 N.W.2d at 662, *cited in part in McShane*, 292 N.W.2d at 259.

■■■ We see no reason to abandon the rule we announced in *McShane*, and therefore we hold that *McShane* provides the appropriate analysis to determine whether the enactment of an airport ordinance restricting land use within runway safety zones amounts to a regulatory taking under the Minnesota Constitution. When an airport ordinance regulates land use within runway safety zones, "there must be compensation to landowners whose property has suffered a substantial and measurable decline in market value as a result of the regulations." *McShane*, 292 N.W.2d at 258–59. Whether a diminution in value has occurred, and the extent of diminution, are questions of fact and, in this case, were resolved by the jury in favor of the landowner. Whether the diminution is substantial is a question of law, and we turn to that legal issue next.[5]

was the destruction of the ability to use the land as a chicken farm, even though other uses remained:

> [T]he land is appropriated as directly and completely as if it were used for the runways themselves.... The path of glide for airplanes might reduce a valuable factory site to grazing land, an orchard to a vegetable patch, a residential section to a wheat field. Some value would remain. But the use of the airspace immediately above the land would limit the utility of the land and cause a diminution in its value.

*Id.* at 262, 66 S.Ct. 1062. In *Penn Central*, the Supreme Court put cases such as *Causby* in a different analytical category:

> Apart from the fact that *Causby* was a case of invasion of airspace that destroyed the use of the farm beneath and this New York City law has in nowise impaired the present use of the Terminal, the Landmarks Law neither exploits appellants' parcel for city purposes nor facilitates nor arises from any

entrepreneurial operations of the city. The situation is not remotely like that in *Causby* where the airspace above the property was in the flight pattern for military aircraft. The Landmarks Law's effect is simply to prohibit appellants or anyone else from occupying portions of the airspace above the Terminal, while permitting appellants to use the remainder of the parcel in a gainful fashion.

*Penn Cent.*, 438 U.S. at 135, 98 S.Ct. 2646.

5. To decide the case before us, we need only affirm that, under *McShane*, when an airport ordinance establishing a Safety Zone A or a Safety Zone B causes a measurable diminution in the value of private property within the zone, then the Minnesota Constitution requires compensation to the property owner if the diminution is substantial. Airport runway safety zoning is arguably *sui generis:* In addition to the significant safety considerations uniquely and obviously attendant to airports,

## B.

▪ The task of determining "whether a taking has occurred is highly fact-specific, depending on the particular circumstances underlying each case." *Wensmann*, 734 N.W.2d at 632 (quotation omitted). As previously discussed, under *McShane* a landowner must be compensated if his or her property sustains a substantial and measurable decline in market value as a result of the application of an airport safety zone ordinance to the property. In *McShane*, the parties agreed the loss of value was substantial. 292 N.W.2d at 256. The parties here do not so agree. The DeCooks contend that the $170,000 decline in market value is substantial, citing "common sense" and a definition of "substantial" as "[o]f real worth and importance; of considerable value; valuable." *See Black's Law Dictionary* 1428 (6th ed.1990). The Board contends the lost value is not substantial given that, depending on property valuations adopted in evaluating the loss, the DeCooks have suffered a loss of either 6.4% or 3.5% of the total value of the

property and such a deprivation is essentially de minimis.

As the Board notes, *McShane* specifically warned that not "every landowner who is in some way limited or inconvenienced by [airport zoning] regulation is entitled to compensation." 292 N.W.2d at 259. It may well be that, in some other regulatory takings dispute, arithmetic calculations such as those urged by the Board will be persuasive.

▪ But here, evaluating the facts and circumstances underlying this case, we conclude the $170,000 diminution in the value of the DeCook property caused by Ordinance No. 4 is substantial. Not only is there merit to the argument advanced by the DeCooks—that by any definition $170,000 in damages is substantial—it is also worth noting that the damages awarded by the jury exceeded the purchase price paid by the DeCooks for the entire 240–acre parcel less than 15 years before enactment of Ordinance No. 4, which caused the diminution in value suffered by the DeCooks.[6] Because we conclude as a matter of law that the application of Safety

---

airport safety zoning, particularly Zone A provisions, impose draconian limitations on what are frequently large parcels of private property. *See supra*, note 1.

Outside the context of airport safety zoning, we have not often—nor recently—drawn a distinction between arbitration and enterprise regulations. *Cf. Spaeth v. City of Plymouth*, 344 N.W.2d 815, 821 (Minn.1984) (holding that *McShane* does not apply when the government has physically appropriated property); *City of Mankato v. Hilgers*, 313 N.W.2d 610, 613 (Minn.1981) (holding that *McShane* does not apply when the government commenced condemnation proceedings to acquire land within a runway Zone A rather than enact land-use regulations); *Pratt v. State, Dept. of Natural Res.*, 309 N.W.2d 767, 774 (Minn.1981) (finding that State prohibition on mechanical harvesting of wild rice had both enterprise and arbitration functions and stating that in *McShane*, "the governmental enterprise function of a regulation was not just

predominant but exclusive. Whether a regulation effects a taking is rarely so simple an issue."). In *Wensmann*, a case that did not deal with airport zoning, we noted in dicta that the enterprise-arbitration distinction may be considered by a court when it assesses the character of the government action as a factor to be balanced in a *Penn Central* analysis—along with the economic impact of the regulation and the extent of any interference with distinct, investment-backed expectations. 734 N.W.2d at 633, 641 n. 14.

6. Ordinance No. 4 applied Safety Zone A to land that had been outside the Safety Zone A established by Ordinance No. 3. The underlying zoning of the land to which Ordinance No. 4 applied Safety Zone A for the first time would have allowed commercial and light industrial development. After Ordinance No. 4, there are few possible uses for the land—chiefly agriculture and similar activities.

Zone A to the DeCooks' property resulted in a substantial diminution in the value of the DeCooks' property, we hold that a regulatory taking occurred under the Minnesota Constitution.

We affirm the court of appeals and remand to the district court to enter judgment in favor of the DeCooks.

Affirmed and remanded.

STRAS, J., took no part in the consideration or decision of this case.

