STATE OF MINNESOTA

IN SUPREME COURT

A23-0191

Court of Appeals

Fletcher Properties, Inc., et al.,

        Appellants,

vs.

City of Minneapolis,

        Respondent,

Poverty & Race Research Action Council, et al.,

        Respondents,

HOME Line,

        Respondent.

McKeig, J.
Took no part, Gaïtas, J.

Filed: July 30, 2025
Office of Appellate Courts

———————————————

Tamara O'Neill Moreland, Inga K. Kingland, Larkin Hoffman Daly & Lindgren Ltd., Minneapolis, Minnesota, for appellants.

Kristyn Anderson, Minneapolis City Attorney, Kristin R. Sarff, Tracey N. Fussy, Assistant City Attorneys, Minneapolis, Minnesota, for respondent City of Minneapolis.

Lawrence McDonough, Samuel Spaid, Daniel P. Suitor, Bloomington, Minnesota, for respondent HOME Line.

Keith Ellison, Attorney General, Rachel Bell-Munger, Anne Kealing, Assistant Attorneys General, Saint Paul, Minnesota, for amicus curiae Minnesota Department of Human Rights and Minnesota Housing Finance Agency.

Keith Ellison, Attorney General, Liz Kramer, Solicitor General, Michael Goodwin, Katherine Kelly, Rebecca Stillman, Assistant Attorneys General, Saint Paul, Minnesota, for amicus curiae State of Minnesota.

John D. Cann, Margaret Kaplan, Shana Tomenes, Housing Justice Center, Saint Paul, Minnesota, for amicus curiae Minnesota Housing Partnership.

_____

S Y L L A B U S

1.　　Those portions of title 7, chapter 139, of the Minneapolis Code of Ordinances that prohibit an owner from refusing to rent residential property to an individual because of any requirement of a public assistance program do not violate the Minnesota Constitution's Takings Clause, Minn. Const. art. I, § 13.

2.　　Those portions of title 7, chapter 139, of the Minneapolis Code of Ordinances that prohibit an owner from refusing to rent residential property to an individual because of any requirement of a public assistance program are not preempted by the Minnesota Human Rights Act.

Affirmed.

O P I N I O N

McKEIG, Justice.

Appellants are persons and entities who own multi-tenant residential properties in Minneapolis (collectively, Fletcher).　An ordinance adopted by respondent City of Minneapolis (the Ordinance) prohibits certain property owners, property managers, and others (collectively, Minneapolis landlords) from refusing to rent property to tenants when their refusal is motivated by a desire to avoid the burden of complying with the requirements of a public assistance program, including Section 8 of the United States Housing Act of 1937, 42 U.S.C. § 1437f　In a previous appeal in this matter, we concluded that the Ordinance does not violate the Minnesota Constitution's guarantees of substantive

1

due process and equal protection. *Fletcher Props., Inc. v. City of Minneapolis*, 947 N.W.2d 1, 6 (Minn. 2020). Fletcher now asserts two claims under Minnesota law: (1) that the Ordinance violates the Takings Clause of the Minnesota Constitution, Minn. Const. art. I, § 13; and (2) that the Ordinance is preempted by the Minnesota Human Rights Act (MHRA), Minn. Stat. chapter 363A (2024). Because we conclude that the Ordinance does not effect a taking under the Minnesota Constitution, and it is not preempted by the MHRA, we affirm.

## FACTS

The Housing Choice Voucher program (HCV or voucher program), is part of the federal program, known as Section 8, that provides rent subsidies to eligible families, seniors, and people with disabilities to help them pay for housing in the private market. *See generally* 42 U.S.C. § 1437f(o); 24 C.F.R. § 982.1(a) (2024). The United States Department of Housing and Urban Development (HUD) funds Section 8 programs. Specifically, HUD "pays rental subsidies so eligible families can afford decent, safe, and sanitary housing." 24 C.F.R. § 982.1(a)(1). Local public housing authorities enter annual contracts with HUD, and they administer the program in their region. 24 C.F.R. § 982.151(a) (2024). In Minneapolis, the Minneapolis Public Housing Authority (MPHA) administers the voucher program. *Fletcher Props., Inc. v. City of Minneapolis* (*Fletcher I*), 947 N.W.2d 1, 7 (Minn. 2020).

Under the HCV program, families can select privately owned rental units that meet "housing quality standards." 24 C.F.R. § 982.1(a)(2). The family pays a portion of the rent, usually about 30 percent of their income. *See* 24 C.F.R. § 982.1(a)(3). The public

2

housing authority—here, MPHA—pays the remainder of the rent, up to a maximum amount based on HUD's calculation of the fair market value for the area. *See* 42 U.S.C. § 1437f(c)(1)(B); 24 C.F.R. § 982.4(b) (2024); 24 C.F.R. § 982.1(a)(2).

Under federal law, participation in the HCV program is voluntary for both landlords and tenants. *See, e.g.*, *Salute v. Stratford Greens Garden Apartments*, 136 F.3d 293, 296 (2d Cir. 1998); *Knapp v. Eagle Prop. Mgmt. Corp.*, 54 F.3d 1272, 1280 (7th Cir. 1995). Owners who participate in the program enter into a Housing Assistance Payments Contract (HAP contract) with the public housing authority for each participating tenant. *See* 24 C.F.R. § 982.451(a)(1) (2024). A HAP contract is a legal agreement between a public housing authority and a property owner that outlines the terms of rental assistance for a specific unit under the HCV program. As part of the HAP contract, landlords must, among other things, specify a minimum length of initial lease and agree to maintain the rental unit according to housing quality standards. 24 C.F.R. § 982.401 (2024). The HAP contract also provides that the public housing agency, in this case the MPHA, may change the amount it pays to a landlord during the contract term upon notice. As part of the HAP contract, landlords must agree to a tenancy addendum. The tenancy addendum outlines the specific terms and conditions of the tenancy, particularly those related to the HCV program. In Minnesota, the MPHA allows owners to retain and enforce the terms of their own lease under the HCV program.

Before a voucher holder rents a unit, the MPHA conducts an inspection to determine whether the unit meets HCV housing quality standards (HQS inspection).[1] 24 C.F.R. § 982.305(b)(1)(i) (2024). After the initial inspection, periodic HQS inspections must be conducted at least biennially. 24 C.F.R. § 982.405(b) (2024).

As of 2018, the MPHA administered around 4,870 vouchers annually, benefiting about 17,000 people. Rental housing in Minneapolis has become increasingly competitive and expensive over the past 10 years. Certain types of units are extremely scarce; for "rental units accessible to very low-income families," the vacancy rate has been less than one percent.

In June 2015, the Minneapolis City Council published notice of its intent to introduce an amendment "prohibiting discrimination based on receipt of public assistance, including tenant-based Section 8 assistance." Over the next two years, the City conducted meetings and phone calls with owners, tenants, advocates, and representatives of industry organizations. It also held focus groups and large meetings with individual stakeholders and the public at large.

In March 2017, the City amended the section of its civil rights ordinances addressing discrimination in real estate. Before the amendment, the section prohibited landlords from refusing to rent to prospective tenants "because of race, color, creed, religion, ancestry,

---

[1] All Minneapolis rental properties are also subject to city and state regulations that may require property inspections, including the Minneapolis Housing Maintenance Code, MCO, tit. 12, § 244 (2025); Minneapolis State Building Code, MCO, tit. 5 (2025) (adopting the Minnesota State Building Code, Minn. Stat. §§ 326B.101–.16 (2024)); and Minnesota State Fire Code, Minn. Stat. § 299F.011 (2024). Minneapolis rental properties are subject to other federal, state, and local regulations.

4

national origin, sex, sexual orientation, gender identity, disability, marital status, status with regard to public assistance or familial status." Minneapolis Code of Ordinances (MCO), tit. 7, § 139.40(e) (2016). The amendment made it "an unfair discriminatory act" for a landlord to refuse to rent to a prospective tenant "because of . . . any requirement of a public assistance program." MCO, tit. 7, § 139.40(e) (2017).

The City amended the Ordinance again in December 2017. It currently reads, as is relevant here:

> (e) *Discrimination in property rights*. It is an unlawful discriminatory practice for an owner, lessee, sublessee, managing agent, real estate broker, real estate salesperson or other person having the right to sell, rent or lease any property, or any agent or employee of any of these, when race, color, creed, religion, ancestry, national origin, sex, sexual orientation, gender identity, disability, marital status, familial status, emancipated minor status, *status with regard to a public assistance program, or any requirement of a public assistance program is a motivating factor*:
>
> (1) To refuse to sell, rent or lease, or to refuse to offer for sale, rental or lease; or to refuse to negotiate for the sale, rental, or lease of any real property; or to represent that real property is not available for inspection, sale, rental, or lease when in fact it is so available; or to otherwise make unavailable any property or any facilities of real property. It is an affirmative defense if the refusal, denial, or withholding is due to a requirement of a public assistance program and that requirement would impose an undue hardship. The department may promulgate rules or regulations establishing standards for undue hardship determinations.
>
> . . . .

MCO, tit. 7, § 139.40(e)(1) (2025) (emphasis added). Under the Ordinance, the HCV program is a public assistance program. MCO, tit. 7, § 139.20 (2025) (defining "[p]ublic assistance program" to include any "tenant-based federal, state or local subsidies,

5

including, but not limited to, rental assistance, rent supplements, and housing choice vouchers").

As reflected above, the 2017 amendment also includes an affirmative defense of undue hardship for landlords. Minneapolis landlords may raise the defense if a "refusal, denial, or withholding is due to a requirement of a public assistance program and that requirement would impose an undue hardship." MCO, tit. 7, § 139.40(e)(1). "Undue hardship" is defined as "a situation requiring significant difficulty or expense when considered in light of a number of factors to be determined on a case-by-case basis." MCO, tit. 7, § 139.20. The factors include, but are not limited to:

(1) The nature and net cost of complying with any requirement of a public assistance program, taking into consideration existing property management processes;

(2) The overall financial resources of the landlord, taking into consideration the overall size of the business with respect to the number of its employees, and the number, type, and location of its housing stock; and

(3) The impact of complying with any requirement of a public assistance program upon the business and dwelling.

*Id.* Whether a landlord qualifies for the undue hardship defense is determined through an administrative process led by the City's Department of Civil Rights. *See generally* MCO, tit. 7, §§ 139.20, 141.80 (2025). A finding of discrimination results in a civil penalty paid to the City and may result in compensatory and punitive damages paid to the aggrieved party. MCO, tit. 7, § 141.50(r) (2025).[2]

---

[2] The Ordinance vests the Minneapolis Department of Civil Rights with the authority to "promulgate rules or regulations establishing standards for undue hardship

6

In June 2017, Fletcher filed a complaint against the City alleging that the Ordinance (1) is preempted by state law; (2) violates the Due Process Clause of the Minnesota Constitution, Minn. Const. art. I, § 7; (3) is an unconstitutional partial regulatory taking, Minn. Const. art. I, § 13; (4) unlawfully interferes with freedom of contract; and (5) violates the Equal Protection Clause of the Minnesota Constitution, Minn. Const. art. I, § 2. Fletcher requested temporary and permanent injunctive relief.

The parties cross-moved for summary judgment. The district court granted summary judgment for Fletcher and issued an injunction, concluding that the Ordinance violated the Due Process and Equal Protection Clauses of the Minnesota Constitution. The district court did not address Fletcher's other claims. The court of appeals reversed on both claims and remanded to the district court for consideration of Fletcher's other claims. *Fletcher Props., Inc. v. City of Minneapolis*, 931 N.W.2d 410, 429–30 (Minn. App. 2019). Fletcher sought review before our court, and we granted their petition. We affirmed the court of appeals and concluded that the Ordinance did not violate the Minnesota Constitution's guarantees of substantive due process or equal protection. *Fletcher I*, 947 N.W.2d at 19, 30.

In August 2022, the City renewed its motion for summary judgment on the remaining claims—the takings claim under the Minnesota Constitution, the preemption claim under Minnesota law, and the freedom-of-contract claim. Fletcher opposed the City's motion and cross-moved for summary judgment on their state law takings and

_____

determinations." MCO, tit. 7, § 139.40(e)(1). It does not appear that such rules or regulations have been promulgated yet.

preemption claims.  Fletcher requested that the district court dismiss their freedom of contract claim.[3]

The district court granted the City's motion for summary judgment, denied Fletcher's motion for summary judgment, and dissolved the temporary injunction.  Fletcher again appealed to the court of appeals.  The court of appeals affirmed the district court's decision, denying Fletcher's state law takings and preemption claims.  *Fletcher Props., Inc. v. City of Minneapolis* (*Fletcher II*), 2 N.W.3d 544, 562 (Minn. App. 2024).

Fletcher again filed a petition for review, which we granted.

## ANALYSIS

This case comes to us on appeal from a grant of summary judgment.  We review a grant of summary judgment de novo.  *Kratzer v. Welsh Cos.*, 771 N.W.2d 14, 18 (Minn. 2009).  We view the evidence "in the light most favorable to the party against whom judgment was granted"—here, Fletcher.  *See Fabio v. Bellomo*, 504 N.W.2d 758, 761

---

[3]     Housing Justice Center (HJC), Poverty & Race Research Action Council (PRRAC), and HOME Line each made a motion before the district court for leave to file amicus briefs. Fletcher opposed amici's request for leave to file amicus briefs.  The district court granted amici leave to file amicus briefs.  In February 2023, the court of appeals issued an order recognizing PRRAC, HJC, and Home Line as "respondents on appeal" and explaining that "[b]ecause appellants are challenging the district court's rulings in favor of the amici, they are respondents on appeal, even though they were not parties to the underlying action." *Fletcher Props., Inc. v. City of Minneapolis*, No. A23-0191, Order at 2 (Minn. App. filed Feb. 24, 2023).  On appeal, the court of appeals concluded that "the district court did not abuse its discretion in allowing amici participation."  *Fletcher Props., Inc. v. City of Minneapolis* (*Fletcher II*), 2 N.W.3d 544, 562 (Minn. App. 2024).  Fletcher requested review of this decision regarding amici participation in their petition for review to our court, but we did not grant review on the issue.

8

(Minn. 1993). We will affirm the judgment "if no genuine issues of material fact exist and if the court below properly applied the law." *Kratzer*, 771 N.W.2d at 18.

Here, Fletcher challenges the constitutionality of the Ordinance under the Minnesota Constitution's Takings Clause and as preempted by the Minnesota Human Rights Act (MHRA). The constitutionality of a law is a question of law which we review de novo. *State v. Larsen*, 650 N.W.2d 144, 147 (Minn. 2002). We exercise our power to declare laws unconstitutional "with extreme caution and only when absolutely necessary." *McCaughtry v. City of Red Wing*, 831 N.W.2d 518, 522 (Minn. 2013) (citation omitted) (internal quotation marks omitted). A city ordinance is presumed constitutional and the burden of proving it is unconstitutional falls on the party challenging its constitutionality. *Id.*

I.

We first address whether the City's requirement that landlords accept public housing renters unless the landlord establishes undue hardship is a taking under the Minnesota Constitution's Takings Clause.[4] Whether a governmental entity's action constitutes a taking is a question of law that we review de novo. *Wensmann Realty, Inc. v. City of Eagan*, 734 N.W.2d 623, 631 (Minn. 2007).

The Minnesota Constitution provides that "[p]rivate property shall not be taken, destroyed or damaged for public use without just compensation therefor, first paid or

---

[4] To be clear, Fletcher has not claimed that the Ordinance violates the United States Constitution's Takings Clause at any point during litigation. At oral argument before our court, Fletcher's counsel directly stated that they brought their claim solely under the Minnesota Constitution's Takings Clause and not the United States Constitution.

secured."[5]  Minn. Const. art. I, § 13.  The purpose of the Minnesota Takings Clause is to "ensure that the government does not require some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."  *Wensmann*, 734 N.W.2d at 632 (citation omitted) (internal quotation marks omitted).  Fletcher argues that the Ordinance will make Minneapolis rental properties available for certain private individuals while forcing landlords to bear the economic burden.

Under the Minnesota Takings Clause, a constitutional taking may occur through a physical taking or a regulatory taking.  Physical takings occur when the government directly appropriates or physically invades property.  *See, e.g.*, *Wegner v. Milwaukee Mut. Ins. Co.*, 479 N.W.2d 38, 40 (Minn. 1991) (recognizing private landowners' right to just compensation for physical invasion).  Government action that physically invades property by means of a regulation is no less a physical taking.  A regulatory taking occurs when the government "goes too far in its regulation, so as to unfairly diminish the value of the individual's property, thus causing the individual to bear the burden rightly borne by the public."  *Wensmann*, 734 N.W.2d at 632 (quoting *Westling v. County of Mille Lacs*, 581 N.W.2d 815, 823 (Minn. 1998)) (internal quotation marks omitted).  The challenge, as we have previously identified it, is to discern how far is "too far."  *Id.* (citation omitted)

---

[5]  Fletcher argues that the Ordinance is an unconstitutional taking because it does not take property for public use.  They assert that the public as a whole is not the beneficiary of the Ordinance; instead, only HCV holders benefit.  Public use is an independent requirement under the Minnesota Constitution's takings clause.  *See Wegner v. Milwaukee Mut. Ins. Co.*, 479 N.W.2d 38, 40 (Minn. 1991) ("A more significant restriction on recovery under this provision [Article I, Section 13, of the Minnesota Constitution] is the requirement that the taking or damaging must be for a public use.").  Because we conclude that no taking has occurred, we do not reach the question of public use.

10

(internal quotation marks omitted). Fletcher argues that the Ordinance effects a physical taking because it requires landlords to suffer a physical invasion of their property. Alternatively, they assert that the Ordinance effects a regulatory taking because it unfairly diminishes the value of landlords' property.

As a threshold matter, the nature of our inquiry depends on the type of challenge Fletcher brings to the Ordinance—whether it is facial or as-applied. *See McCaughtry*, 831 N.W.2d at 522 (discussing facial versus as-applied challenges to the constitutionality of a law). Fletcher chose to challenge the Ordinance on its face. We have repeatedly stated that a facial challenge requires the challenger to demonstrate that the challenged action is unconstitutional in all its applications. *See, e.g.*, *id.*; *Olson v. One 1999 Lexus MN License Plate No. 851LDV VIN: JT6HF10U6X0079461*, 924 N.W.2d 594, 607 (Minn. 2019) (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987) (noting that a facial challenge is "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the [legislation] would be valid") (alteration in original)). We have previously applied this standard to facial challenges implicating the Minnesota Takings Clause. *See, e.g.*, *Naegele Outdoor Advert. Co. of Minn. v. Village of Minnetonka*, 162 N.W.2d 206, 213 (Minn. 1968) ("Plaintiff cannot successfully challenge this ordinance as unconstitutional on its face unless it would be unconstitutional as applied to the property interests of every billboard owner.").[6] Fletcher therefore bears the "heavy

---

[6]     Fletcher argues that when considering whether the Ordinance effects a taking in all its applications, we should consider only "those [Minneapolis landlords] forced to participate by the regulation," rather than all Minneapolis landlords. We are unpersuaded

burden" of establishing that no set of circumstances exists under which the Ordinance would be valid. *See Minn. Voters All. v. City of Minneapolis*, 766 N.W.2d 683, 696 (Minn. 2009).[7]

A.

We now turn to Fletcher's claim that the Ordinance effects a physical taking under the Minnesota Constitution because it requires landlords to suffer an invasion of their property. We have recognized that a physical taking under the Minnesota Constitution may occur "as a result of the physical appropriation of property." *Dale Props., LLC v. State*, 638 N.W.2d 763, 765 (Minn. 2002). We have also recognized that the Takings

---

by this argument because, given that the Ordinance applies to all Minneapolis landlords and has the potential to impact the property of all Minneapolis landlords, our analysis would be incomplete if we considered only a subsection of the relevant population.

[7]  Fletcher briefly argues that enactment of the Ordinance constituted a facial taking—an argument that is distinct from a facial constitutional challenge. As a general matter, as to claims under the federal takings clause, "[a] facial *taking* . . . occurs when the enactment of a challenged law inherently constitutes a taking of property under the Fifth Amendment, for which the owner is due just compensation." Timothy Sandefur, *The Timing of Facial Challenges*, 43 Akron L. Rev. 51, 62 (2010). Many courts have adopted the theory that a facial takings claim "is not an argument for invalidity *per se*, but rather an argument that the enactment of a law has diminished the plaintiff's property value and that the plaintiff is entitled to compensation at that moment." *Id.* at 63 (discussing *Levald, Inc. v. City of Palm Desert*, 998 F.2d 680 (9th Cir. 1993)).

This type of claim is distinct from a facial constitutional challenge which alleges "that a law is void on its face; that it is necessarily a violation of the Constitution in any and all applications." *Id.* at 61. Fletcher primarily alleges and supports this type of challenge throughout their brief.

"[A] facial takings claim is *not* a facial constitutional challenge. Indeed, a claim for just compensation actually presupposes the constitutional *validity* of the law in question . . . ." *Id.* at 63. Because Fletcher alleges that the Ordinance is constitutionally invalid and that no compensation can remedy the alleged taking, we engage with their argument as a facial constitutional challenge rather than a facial taking.

12

Clause in the Minnesota Constitution includes a physical invasion of the private individual's property. *See Wegner*, 479 N.W.2d at 40.

Fletcher argues that the Ordinance requires Minneapolis landlords to suffer an invasion of their property in two ways. First, Fletcher asserts that the Ordinance requires landlords to lease their properties to HCV holders such that their occupation constitutes a "total and complete" invasion. Essentially, Fletcher argues that through the Ordinance, the City seeks to grant others the right to physically invade the landlords' property. Second, Fletcher contends that Minneapolis landlords are subject to temporary invasions because they must complete HQS inspections as participants in the HCV program. They contend that entry into their property by an HQS inspector constitutes an invasion. We address these two arguments in turn.

First, Fletcher argues that the Ordinance appropriates Minneapolis landlords' right to exclude others from their property by allowing HCV holders to occupy it. They argue that the court of appeals' reliance on the U.S. Supreme Court's decision in *Yee v. City of Escondido*, 503 U.S. 519 (1992), to interpret the Minnesota Constitution's Taking Clause was misplaced. We disagree.

In *Yee*, the Supreme Court considered the constitutionality of a mobile home rent control ordinance. 503 U.S. at 522–23. The rent control ordinance limited the bases on which the mobile home park owners could terminate a mobile home owner's tenancy, including nonpayment of rent, violation of law or park rules, and the park owner's desire to change the use of his land. *Id.* at 524. The issue before the *Yee* court was whether such a regulatory scheme constituted a physical taking of property. *Id.* at 523.

13

The Supreme Court concluded that the ordinance did not amount to a physical taking because it did not authorize an unwanted physical occupation of the mobile home park owner's property. *Id.* at 527–28. The Court explained that no government required any physical invasion of the petitioners' property because the petitioners had voluntarily rented their land to others. *Id.* Based on previous decisions, the Court reiterated that "[w]hen a landowner decides to rent his land to tenants, the government may place ceilings on the rents the landowner can charge or require the landowner to accept tenants he does not like without automatically having to pay compensation" under the Takings Clause. *Id.* at 529 (citations omitted). The Court concluded that the laws at issue merely regulated mobile home park owners' use of their land by regulating the relationship between landlord and tenant. *Id.* at 528.

The Court rejected the petitioners' allegation that the mobile home rent control ordinance effected a physical taking because it deprived the mobile home park owners of the ability to choose incoming tenants. *Id.* at 530–31. The Court again stressed that the mobile home park owners had "voluntarily open[ed] their property to occupation by others" and thus could not assert a *per se* right to compensation based on their inability to exclude particular individuals. *Id.* at 531 (citing *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 261 (1964)). The Court explained that "this effect may be relevant to a regulatory taking argument," but because the petitioners' did not bring such a claim, the Court did not address it. *Id.*

We adopt the *Yee* analysis as the proper analysis under the Minnesota Constitution given the circumstances presented here. "The government effects a physical taking only

14

where it *requires* the landowner to submit to the physical occupation of his land." *Id.* at 527. "This element of required acquiescence is at the heart of the concept of occupation." *Id.* (quoting *FCC v. Fla. Power Corp.*, 480 U.S. 245, 252 (1987)) (internal quotation marks omitted). Minneapolis landlords voluntarily rent their properties to tenants. Once a landlord makes this voluntary decision, the City does not compel them to continue doing so. To the contrary, landlords are free to change the use of their land with proper notice. *Cf.* Minn. Stat. § 504B.147, subd. 3 (2024) (prohibiting a landlord from giving "a notice to quit the premises or notice of a rent increase that is shorter than the time period the lease provides for the tenant to give notice of an intention to quit the premises"); Minn. Stat. § 504B.255 (2024) (describing the conditions under which a landlord must give residential tenants of federally subsidized rental housing written notice of termination). The Ordinance, like the ordinance in *Yee*, does not authorize an unwanted physical occupation of petitioners' property; instead, it is a regulation of Fletcher's voluntary use of their property. Once a Minneapolis landlord voluntarily invites prospective tenants to live in their rental property, the Ordinance regulates *how* the property may be rented. When a landlord voluntarily rents property to the public, a government entity may regulate the terms under which the landlord leases their property without necessarily effecting a physical taking. We therefore conclude that the Ordinance does not amount to a physical taking on these grounds.

We similarly find that the HQS inspections do not constitute an invasion of Minneapolis landlords' property under the Minnesota Constitution. Again, Minneapolis landlords are not compelled to be landlords; their properties are subject to HQS inspection

15

only because they voluntarily rent their properties to tenants. Moreover, we agree that under the Minnesota Constitution, like the United States Constitution, "government health and safety inspection regimes will generally not constitute takings." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 161 (2021) (citing *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1007 (1984)).[8] Here, we have recognized a connection between housing, public health, and safety. *See, e.g.*, *Cent. Hous. Assocs., LP v. Olson*, 929 N.W.2d 398, 409 (Minn. 2019) ("Evictions of tenants—some resulting in homelessness—based on their complaints about habitability are inimical to public health, safety, and welfare."). HQS inspections, like many other health and safety inspection regimes, ensure that "all residents live in safe, habitable dwellings, the items and components located inside the building, outside the building, and within the units of HUD housing [are] functionally adequate, operable, and free of health and safety hazards." 24 C.F.R. § 5.703(a) (2024). That the Ordinance allows the City access to a landlord's property to conduct HQS inspections is not an appropriation or invasion giving rise to a physical taking under the Minnesota Constitution.

---

[8] Fletcher broadly argues that *Cedar Point* compels that the Ordinance constitutes a physical taking. But as the court of appeals appropriately observed, *Cedar Point* itself recognized that " '[l]imitations on how a business generally open to the public may treat individuals on the premises are readily distinguishable from regulations granting a right to invade property closed to the public' and 'government health and safety inspection regimes will generally not constitute takings.' " *Fletcher II*, 2 N.W.3d at 554 (quoting *Cedar Point*, 594 U.S. at 157, 161). And we agree with the court of appeals that *Yee* is on point to the circumstances here, in that " '[w]hen a landowner decides to rent his land to tenants, the government may . . . require the landowner to accept tenants he does not like . . . without automatically having to pay compensation.' " *Id.* (alteration by court of appeals) (citations omitted) (quoting *Yee*, 503 U.S. at 529).

B.

Having concluded that the Ordinance does not effect a physical taking of Minneapolis landlords' property under the Minnesota Constitution, we now address whether it effects a regulatory taking under the Minnesota Constitution. We have recognized that "government regulation—by definition—involves the adjustment of rights for the public good," and "[o]ften this adjustment curtails some potential for the use or economic exploitation of private property." *Wensmann*, 734 N.W.2d at 632 (alteration in original) (citation omitted) (internal quotation marks omitted). Nevertheless, the government need not directly appropriate or physically invade private property to effectuate a taking. Instead, in limited circumstances, government regulation of property can result in a taking. *See Westling*, 581 N.W.2d at 823 ("Thus the taking, if any, falls into the realm of economic regulation, by imposing a tax theoretically in excess of the property's value."). A government regulation may result in a taking when the government goes "too far," and "unfairly diminish[es] the value of the individual's property, thus causing the individual to bear the burden rightly borne by the public." *Id.* at 823 (citation omitted) (internal quotations omitted). The determination of whether a regulatory taking has occurred is "highly fact-specific, depending on the particular circumstances underlying each case." *Id.*

When considering regulatory takings claims under the Minnesota Constitution, we have generally adopted the flexible test developed in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 123–29 (1978), which balances three factors: the economic impact of the regulation, its interference with reasonable investment-backed expectations,

17

and the character of the government action. *See, e.g.*, *Wensmann*, 734 N.W.2d at 632–42; *Westling*, 581 N.W.2d at 823–24; *Zeman v. City of Minneapolis*, 552 N.W.2d 548, 552 (Minn. 1996); *State ex rel. Powderly v. Erickson*, 285 N.W.2d 84, 90 (Minn. 1979); *Pratt v. State, Dep't of Nat. Res.*, 309 N.W.2d 767, 774 (Minn. 1981). Because the circumstances under which we would apply an alternative test do not exist in this case,[9] we apply the *Penn Central* factors to determine whether the Ordinance effects a regulatory taking under the Minnesota Constitution.

The first *Penn Central* factor considers the economic impact of the Ordinance. The inquiry under this factor "turns in large part, albeit not exclusively, upon the magnitude of

---

[9]     In certain contexts, we have opted not to apply the *Penn Central* test. This is because even if a takings claim fails under the United States Constitution based on a *Penn Central* analysis, the property owner may be entitled to compensation under the Minnesota Constitution, based on the greater protections it provides. *See, e.g.*, *DeCook v. Rochester Int'l Airport Joint Zoning Bd.*, 796 N.W.2d 299, 308 (Minn. 2011) (applying a "substantial and measurable decline in market value" test where an airport ordinance regulated land use within a runway safety zone); *see also Johnson v. City of Minneapolis*, 667 N.W.2d 109, 115–16 (Minn. 2003) (evaluating whether an abuse of eminent domain amounted to a regulatory taking by asking if the abuse was "specifically directed against a particular parcel" (citation omitted) (internal quotation marks omitted)).

Although Fletcher acknowledges that the Minnesota Constitution's Takings Clause may provide broader protections than the U.S. Constitution and briefly discusses the "substantial and measurable decline in market value" test that we articulated in *DeCook*, they do not argue we should apply that test here. In discussing the *DeCook* test within their application of the *Penn Central* test, Fletcher fails to acknowledge that these are two separate tests. We have never blended regulatory takings tests and decline to do so here. And even if Fletcher had argued for application of the *DeCook* test instead of the *Penn Central* test, we have explained that the *DeCook* test applies "[w]hen an airport ordinance regulates land use within runway safety zones." *DeCook*, 796 N.W.2d at 307. Under such circumstances, "there must be compensation to landowners whose property has suffered a substantial and measurable decline in market value as a result of the regulations." *Id.* (citation omitted) (internal quotation marks omitted). Those circumstances are not present in this case, and thus the *DeCook* test does not apply here.

a regulation's economic impact and the degree to which it interferes with legitimate property interests." *Wensmann*, 734 N.W.2d at 634 (quoting *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005)) (internal quotation marks omitted). Courts generally do so by "compar[ing] the value that has been taken from the property with the value that remains in the property." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497 (1987).[10] Simply stated, economic impact is ordinarily measured by comparing the market value of the property without the restriction with the estimated value of the property with the restriction.

Fletcher argues that the Ordinance will have a negative economic impact by increasing Minneapolis landlords' operating expenses and capitalization rates. This argument fails because Fletcher cannot establish that the Ordinance would result in a negative economic impact in all its applications.

As an initial matter, the presence of an undue hardship affirmative defense defeats Fletcher's argument that the Ordinance will result in a negative economic impact in all its applications. As we previously acknowledged, "no residential landlord is absolutely subject to the prohibition on refusing to rent because of voucher program requirements. Every residential landlord has the opportunity to seek an exemption from the ordinance provision if compliance with housing choice voucher requirements will impose an undue

---

[10]    Regarding application of the first *Penn Central* factor, we have not articulated a standard that applies in all cases. Fletcher argued that we should apply the *Keystone* standard, and the City did not dispute its application. We therefore assume, without deciding, that the *Keystone* standard applies in this case. *See Heard v. State*, 22 N.W.3d 154, 160 (Minn. 2025) (applying a standard derived from case law where the parties did not dispute its application).

hardship on the landlord." *Fletcher I*, 947 N.W.2d at 28; *see* MCO, tit. 7, § 139.40(e)(1). Undue hardship exists in a situation that requires "significant difficulty or expense when considered in light of a number of factors to be determined on a case-by-case basis." MCO, tit. 7, § 139.20. Determining whether this affirmative defense applies involves considering individualized factors including the "nature and net cost of complying with any requirement of a public assistance program." *Id.* If a landlord successfully asserts the affirmative defense, that landlord need not accept a voucher-holding tenant. In the context of a facial challenge, "[w]here the harm alleged is hypothetical and may or may not occur, the challenger has not met [their] burden." *Minn. Voters All.*, 766 N.W.2d at 696. Because the affirmative defense will apply in some cases—and, presumably, is more likely to apply when the potential economic loss is higher—the Ordinance will not result in a negative economic impact in all applications.

Furthermore, even without consideration of the undue hardship defense, Fletcher has not established that the Ordinance will result in a negative economic impact that rises to the level of a regulatory taking. Fletcher relies on two impact studies—one from 2018 and one from 2022—to quantify the Ordinance's alleged negative economic impact. Notably, both reports conclude that the degree of impact that the Ordinance will have on operating expenses "will vary depending on the specific property." Both reports also determine that the voucher-accepting properties they considered earned higher effective gross incomes than voucher-rejecting properties. And even assuming that the 2018 and 2022 reports demonstrate the reduction in value that Fletcher argued before the district

20

court—26.3 percent and 30.2 percent, respectively[11]—they have not established that this factor weighs in their favor.[12] In several decisions, federal courts have concluded that regulations that result in significant diminutions of value are constitutionally valid. *See Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 384 (1926) (75 percent diminution in value caused by zoning law); *Hadacheck v. Sebastian*, 239 U.S. 394, 405 (1915) (87.5 percent diminution in value); *Colony Cove Props., LLC v. City of Carson*, 888 F.3d 445, 451 (9th Cir. 2018) (explaining that the court had "observed that diminution in property value because of governmental regulation ranging from 75% to 92.5% does not constitute a taking" and that the court was "aware of no case in which a court has found a taking where diminution in value was less than 50 percent" (citation omitted) (internal quotation marks omitted)). Decisions upholding land-use regulations that are reasonably related to the promotion of the general welfare have uniformly found that diminution in property value does not, by itself, establish a taking. *Penn Cent.*, 438 U.S. at 131 (collecting cases). Even assuming these valuation reductions would occur upon enforcement of the Ordinance, they fall short of the economic loss needed to establish a regulatory taking under *Penn Central*. This is especially true given that the Ordinance is related to the promotion of the general welfare, which we discuss in greater detail under the third factor. This *Penn Central* factor therefore weighs against Fletcher.

---

[11]     The studies calculated the valuation of income-producing property by dividing the net operating income by the capitalization rate. The valuation reduction is the difference in the fair market value of the property before and after application of a regulation.

[12]     In its principal brief to our court, Fletcher seemed to argue that the Ordinance would result in an 8.9 percent reduction in value.

The second *Penn Central* factor requires the court to examine whether the Ordinance has interfered with landlords' "distinct investment-backed expectations." *Id.* at 124. The "heavily regulated nature" of an industry discounts a party's reasonable expectations. *See Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 645 (1993) ("Those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." (alteration omitted) (citation omitted) (internal quotation marks omitted)). We have said that in "examining a property owner's investment-backed expectations, the existing and permitted uses of the property when the land was acquired generally constitute the primary expectation of the landowner regarding the property." *Wensmann*, 734 N.W.2d at 637 (citation omitted) (internal quotation marks omitted).

Fletcher characterizes their investment-backed expectation as "the ability to rent as market rental, with market rental cap rate, market rental operating costs, and without participation in the HCV program." Their suggestion that Minneapolis landlords reasonably purchase property with specific financial expectations is unsupported. Any number of factors may affect a property's profitability. *See First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 770 (1994) ("The value and profitability of multi-unit apartment complexes . . . however, depend upon many factors that influence the general real estate market including changes in rent control laws, property taxes, vacancy rates, the level of city services provided, and increased operating expenses including electric and heating oil prices."). We therefore reject Fletcher's narrow characterization of Minneapolis landlords' investment-backed expectation.

22

The Ordinance does not alter Minneapolis landlords' primary expectation regarding their property. When landlords buy a rental property, their primary expectation is to lease it to tenants. *Cf. Zeman*, 552 N.W.2d at 553–54 ("[A]s Zeman has operated this property as a rental dwelling since acquiring it in 1975, it would appear that he has some investment-backed expectations in its use as such."). The Ordinance does not transform Minneapolis landlords' property into something other than rental property. After application of the Ordinance, the landlords will continue to use their property as they primarily intended—as rental units. Thus, the landlords' expectations continue to be realized. We therefore conclude that the investment-backed expectations factor weighs against Fletcher.

The last *Penn Central* factor considers the character of the government action. "A 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Cent.*, 438 U.S. at 124 (citation omitted). We have said that the appropriate focus of this factor is on the "*nature* rather than the merit of the governmental action," with an "important consideration" being "whether the regulation is general in application or whether the burden of the regulation falls disproportionately on relatively few property owners." *Wensmann*, 734 N.W.2d at 639 (citation omitted) (internal quotation marks omitted) (finding character of government action weighed in favor of owner of golf course who was forced to shoulder a disproportionate burden for the public good of park spaces); *see also Johnson v. City of Minneapolis*, 667 N.W.2d 109, 115–16

(Minn. 2003) (finding taking where city's eminent domain power was "specifically directed against a particular parcel" (citation omitted) (internal quotation marks omitted)).

The Ordinance serves a broad public purpose and applies to all Minneapolis rental properties. The City articulated three purposes for the Ordinance: (1) to increase housing opportunities for voucher holders, (2) to address the discriminatory effect of housing denial, and (3) to prohibit prejudice-based discrimination against voucher holders. *Fletcher I*, 947 N.W.2d at 11–12. The City enacted the Ordinance due to problems that voucher holders face in finding housing. We previously concluded that each of the three purposes is a permissible legislative goal. *Id.* On its face, the Ordinance applies to all buildings that have a rental license in Minneapolis, aside from certain exemptions already ruled to be lawful.[13] *Id.* at 9, 11–12. Thus, this factor also weighs against Fletcher.

None of the *Penn Central* factors supports the conclusion that the Ordinance effects a regulatory taking under the Minnesota Constitution. We therefore conclude that the court of appeals did not err in affirming the district court's decision to grant summary judgment

---

[13] The Ordinance provides that the following categories of rental units need not show undue hardship to be exempt from the program: rental units in owner occupied single-family dwellings, rental units in owner-occupied duplexes, previously homesteaded single dwelling units rented for 36 or fewer months, and single dwelling units that were owner occupied prior to an owner's active military duty. MCO, tit. 7, § 139.30(b) (2025). In *Fletcher I*, we concluded that "the distinction between owners who must show undue hardship and those who are automatically exempt from the ordinance is a rational method to achieve the exemptions' legislative purpose." 947 N.W.2d at 30. In reaching this conclusion, we noted that owners of the automatically exempted properties "are likely to be able to demonstrate undue hardship and, accordingly, the limited government resources needed to conduct a case-by-case analysis of such properties would be better used for other purposes." *Id.* at 28.

dismissing Fletcher's facial challenge to the Ordinance as effecting a regulatory taking under the Minnesota Constitution was proper.[14]

## II.

We next consider Fletcher's argument that the Ordinance is preempted by state law. Fletcher argues that the MHRA preempts the Ordinance. "Preemption of municipal ordinances by state law is a legal question subject to de novo review." *Bicking v. City of Minneapolis*, 891 N.W.2d 304, 312 (Minn. 2017).

The City of Minneapolis is a home-rule-charter city. "The general rule is that, in matters of municipal concern, home rule cities have all the legislative power possessed by the legislature of the state, save as such power is expressly or impliedly withheld."[15] *Bolen*

---

[14] Fletcher argued that the proper remedy is invalidation of the ordinance. The remedy for a facial taking may be different from that for most other facial challenges. Generally, if a court finds that a law is unconstitutional on its face, "[t]he proper remedy . . . is typically not compensation but an injunction against enforcement and a declaration that the law is invalid." Sandefur, *supra* note 7, at 61; *see also Olson*, 924 N.W.2d at 607 n.8 (describing invalidation as a remedy for facial challenges). In contrast, some courts—applying the federal Constitution's Takings Clause—have concluded that "a facial takings claim is not an argument for invalidity *per se*" because the Fifth Amendment permits takings so long as the government provides just compensation. Sandefur, *supra* note 7, at 63. Because we find that the Ordinance does not effect a taking under the Minnesota Constitution, we refrain from deciding the appropriate remedy—just compensation, invalidation, or something else—for a law that violates the Minnesota Constitution's Takings Clause on its face.

[15] Home-rule-charter cities' power can be contrasted with the general rule for statutory cities that "municipalities have no inherent powers and possess only such powers as are expressly conferred by statute or implied as necessary in aid of those powers which have been expressly conferred" but "once [a] municipality is granted a charter with a general welfare clause . . . that clause will be construed liberally to allow effective self-protection by the municipality." *Mangold Midwest Co. v. Village of Richfield*, 143 N.W.2d 813, 820 (Minn. 1966).

*v. Glass*, 755 N.W.2d 1, 4–5 (Minn. 2008) (citation omitted) (internal quotation marks omitted).  Although home-rule-charter cities have broad power to legislate, "state law may limit the power of a city to act in a particular area."  *City of Morris v. Sax Invs., Inc.*, 749 N.W.2d 1, 6 (Minn. 2008).  When the Legislature grants a municipality the power to govern itself through a home rule charter, it is not precluded from preempting the charter authority on matters of state concern.  *Id.*; *see also State ex rel. Town of Lowell v. City of Crookston*, 91 N.W.2d 81, 83 (Minn. 1958) ("The adoption of any charter provision contrary to the public policy of the state, as disclosed by general laws or its penal code, is . . . forbidden."); *St. Paul Citizens for Hum. Rights v. City Council*, 289 N.W.2d 402, 405 (Minn. 1979) ("A municipal ordinance will be upheld unless it is inconsistent with the Federal or State Constitution or state statute.").  We have recognized that "[t]here are three types of state preemption of municipal legislative authority: express preemption, conflict preemption, and field preemption."  *Minn. Chamber of Com. v. City of Minneapolis*, 944 N.W.2d 441, 447 (Minn. 2020) (citation omitted) (internal quotation marks omitted); *Bicking*, 891 N.W.2d at 313 n.8.  Fletcher argues the last two types of preemption apply in this case.  We discuss each in turn.

### A.

We turn first to the question of conflict preemption.  Our decision in *Mangold Midwest Co. v. Village of Richfield* states a general rule we apply to determine if conflict preemption exists: "conflicts which would render an ordinance invalid exist only when both the ordinance and the statute contain express or implied terms that are irreconcilable with each other."  143 N.W.2d 813, 816 (Minn. 1966); *see also Minn. Chamber of Com.*,

26

944 N.W.2d at 447. We identified two circumstances where an irreconcilable conflict between a municipal regulation and state law exists. *Mangold*, 143 N.W.2d at 816–17. First, a "conflict exists where the ordinance permits what the statute forbids." *Id.* at 816. Second, "a conflict exists where the ordinance forbids what the statute *expressly* permits." *Id.* We also stated that "no conflict exists where the ordinance, though different, is merely additional and complementary to or in aid and furtherance of the statute." *Id.* at 817.

The MHRA is the state law that prohibits discrimination in Minnesota. *See generally* Minn. Stat. chapter 363A. It is enforced by the Minnesota Department of Human Rights. Minn. Stat. § 363A.06. Generally, the MHRA prohibits discrimination in employment, housing, public accommodations, public services, education, credit, and business based on protected class. Minn. Stat. §§ 363A.08–.19. The MHRA declares an intent to secure "freedom from discrimination" in "housing and real property because of . . . status with regard to public assistance." Minn. Stat. § 363A.02, subd. 1(a)(2).

Fletcher argues that there is an irreconcilable conflict between the Ordinance and implied terms of the MHRA. They contend that the Ordinance forbids what the MHRA permits—nonparticipation in the HCV program. This preemption claim relies on the premise that the MHRA grants Minneapolis landlords an affirmative right to reject voucher holders.

Nothing in the MHRA vests Minneapolis landlords with an affirmative right to reject voucher holders. By its terms, the MHRA does not expressly authorize an owner to refuse to participate in Section 8 housing. Instead, the statute suggests that refusal to lease to a person because of their status as a public assistance recipient is an unfair discriminatory

27

practice. *See* Minn. Stat. § 363A.09 (making it an "unfair discriminatory practice" to refuse to lease to a person because of their status with regard to public assistance); *see also* Minn. Stat. § 363A.21 (setting forth exemptions based on real property).[16] The Ordinance does not forbid anything the MHRA expressly permits.

Fletcher also contends that the Ordinance obstructs the MHRA's purpose and is not complementary to it because the Ordinance "shoehorns program requirements" into a scheme focused on personal characteristics. They argue that this addition obstructs the purposes of the MHRA because it will encourage "wholly unfounded charges of discrimination." *See* Minn. Stat. § 363A.02, subd. 1(b) ("It is also the public policy of this state to protect all persons from wholly unfounded charges of discrimination.").

Fletcher's view of the MHRA's purpose is too narrow. The MHRA is dedicated to "secur[ing] for persons in this state, freedom from discrimination." Minn. Stat. § 363A.02,

---

[16] Fletcher relies on a court of appeals decision interpreting the MHRA to support their argument that the act permits landlords to refuse to participate in Section 8 housing and refuse to let to HCV holders. *See generally Edwards v. Hopkins Plaza Ltd. P'ship*, 783 N.W.2d 171 (Minn. App. 2010). This case does not bind our court regarding the meaning of the MHRA. And even if it did, Fletcher misreads the *Edwards* court's holding. In *Edwards*, the court of appeals concluded that the MHRA "does not require property owners in Minnesota to participate in Section 8 programs," that "refusal to participate in a voluntary program for a legitimate business reason does not constitute discrimination under the MHRA," and that "refusal to renew a lease because of a decision to discontinue participation in a voluntary housing program is not a refusal to rent because of status with regard to public assistance." 783 N.W.2d at 177–78. The court of appeals in the present case astutely acknowledged that "a conclusion that the MHRA *does not require participation* in Section 8 housing is distinct from a conclusion that the MHRA *grants a right not to participate* in Section 8 housing." *Fletcher II*, 2 N.W.3d at 559. In short, the *Edwards* court held that the MHRA does not compel property owners in Minnesota to participate in Section 8 programs. But the *Edwards* court did not hold—and Fletcher provides no other reason to believe—that the MHRA precludes *other* sources of law from doing so.

28

subd. 1(a). Although it does not prohibit discrimination on the same grounds as the Ordinance, the MHRA does recognize that the opportunity to obtain housing without discrimination is a civil right. *Id.*, subd. 2.

In Fletcher's prior appeal, we acknowledged that the Ordinance "expands the list of prohibited reasons for refusing to rent property beyond those already listed in the MHRA and includes the additional provision at issue here, which prohibits landlords from refusing to rent because of the burdens associated with complying with Section 8 requirements." *Fletcher I*, 947 N.W.2d at 16. But a "rule of law that finds a conflict wherever an ordinance adds a requirement different from state law—no matter the substance of the statute or the ordinance—would preempt every local ordinance setting a standard higher than the floor set by the Legislature." *Minn. Chamber of Com.*, 944 N.W.2d at 449. The City may address discriminatory housing denial by utilizing a different, though complementary, approach from the MHRA. When discussing Fletcher's due process claim, we acknowledged:

> There is more than one rational way to reduce or eliminate discrimination against voucher holders. A legislative body rationally could attempt to accomplish that objective by requiring proof that the refusal to rent was "because of" the prospective tenant's *status* as a voucher holder. But a legislative body could also rationally attempt to reduce or eliminate discrimination against voucher holders by removing the burden of the program requirements as a lawful excuse for not participating in the housing choice voucher program.

*Fletcher I*, 947 N.W.2d at 16–17. The same reasoning applies in the preemption context. Here, the Legislature (through the MHRA) and the City (through the Ordinance) utilized

two different but permissible ways to address aspects of the same problem.  We conclude that the Ordinance is complementary to the MHRA, and no conflict exists between them.

B.

We turn next to whether the MHRA occupies the field of preventing discrimination such that it preempts the Ordinance.  Field preemption occurs "when the Legislature has addressed the subject matter in a way that leaves no room for local regulation." *Graco Inc. v. City of Minneapolis*, 937 N.W.2d 756, 759 (Minn. 2020).  In determining whether state law impliedly preempts an ordinance by occupying the field, Minnesota courts consider four factors, known as the *Mangold* factors:

> (1) What is the 'subject matter' which is to be regulated?
> (2) Has the subject matter been so fully covered by state law as to have become solely a matter of state concern?
> (3) Has the legislature in partially regulating the subject matter indicated that it is a matter solely of state concern?
> (4) Is the subject matter itself of such a nature that local regulation would have unreasonably adverse effects upon the general populace of the state?

*Minn. Chamber of Com.*, 944 N.W.2d at 449–50 (quoting *Mangold*, 143 N.W.2d at 820); *see also Graco*, 937 N.W.2d at 762–63.

The first *Mangold* factor is the subject matter to be regulated.  *Minn. Chamber of Com.*, 944 N.W.2d at 449.  The parties agreed before the district court that the subject matter to be regulated by both the MHRA and the Ordinance is "discrimination in housing based on status of public assistance."  We therefore accept this characterization as the relevant subject matter and move to the next *Mangold* factor.

The second *Mangold* factor asks whether the subject matter—housing discrimination based on status of public assistance—has been "so fully covered by state

30

law as to have become solely a matter of state concern." *Minn. Chamber of Com.*, 944 N.W.2d at 450 (citation omitted) (internal quotation marks omitted). We have recognized that "[t]he Legislature's intent to occupy the field may be found in statements of purpose or in the uniform and comprehensive character of the statutory scheme." *Id.* at 450.

The language of the MHRA does not demonstrate any legislative intent to preempt local action by occupying the field of housing discrimination based on status of public assistance. It does not limit the scope of local regulations nor does it express a desire for uniform practices. The MHRA states that "[i]t is the public policy of this state to secure for persons in this state, freedom from discrimination . . . in housing and real property because of race, color, creed, religion, national origin, sex, marital status, disability, status with regard to public assistance, sexual orientation, and familial status." Minn. Stat. § 363A.02, subd. 1(a)(2) (2020).[17] The MHRA's language does not suggest that it is expansive enough to fully cover the subject of housing discrimination such that it is solely a matter of state concern. To the contrary, the Legislature explicitly intended for the MHRA to be broadly construed, suggesting that the Legislature envisioned the act would be a foundation for future anti-discrimination measures like the Ordinance. *See* Minn. Stat. § 363A.04 ("The provisions of this chapter shall be construed liberally for the

---

[17] The Legislature has amended this section of the MHRA since the Ordinance was adopted in 2017. It now provides that "[i]t is the public policy of this state to secure for persons in this state, freedom from discrimination . . . in housing and real property because of one or more of the following: race, color, creed, religion, national origin, sex, gender identity, marital status, disability, status with regard to public assistance, sexual orientation, and familial status." Minn. Stat. § 363A.02, subd. 1(a)(2) (2024).

31

accomplishment of the purposes thereof."); *see also* Minn. Stat. § 363A.02, subd. 1(b) ("Nothing in this chapter shall be interpreted as restricting the implementation of positive action programs to combat discrimination."). Rather than calling for a state-wide, uniform scheme, the MHRA envisions and permits local involvement to combat discrimination. *See* Minn. Stat. § 363A.07 (providing for local commissions); Minn. Stat. § 363A.03, subd. 23 (defining "[l]ocal commission" to include city agencies created "for the purpose of dealing with discrimination on the basis of . . . status with regard to public assistance").

Fletcher argues that the Legislature intended to occupy the relevant field by including a "construction and exclusivity provision" in the MHRA. The MHRA provision Fletcher references provides that the MHRA shall be "construed liberally" to accomplish its purposes and shall not be deemed to "repeal any provisions of the civil rights law or any other law of this state relating to discrimination" against protected classes. This provision also provides that, for "acts declared unfair" under sections 363A.08 to 363A.19 and 363A.28, subdivision 10—none of which involve housing discrimination—the procedures set forth in the MHRA "shall, while pending, be exclusive." Minn. Stat. § 363A.04.[18] Emphasizing this last point, we recently confirmed "[t]he preemption provision applies only where a Human Rights Act claim is 'pending' and only 'as to acts declared unfair' " by the statute. *See Abel v. Abbott Nw. Hosp.*, 947 N.W.2d 58, 80 (Minn. 2020) (quoting Minn. Stat. § 363A.04) (denying preemption of a negligence claim as premature because

---

[18]     In 2024, the Legislature amended this provision. Act of May 15, 2024, ch. 105, § 6, 2024 Minn. Laws 1073, 1074 (codified at Minn. Stat. § 363A.04 (2024)). It now also states that "[t]he rights and remedies herein provided are in addition to, and shall not preclude, those available at law or in equity." Minn. Stat. § 363A.04 (2024).

the court had not decided whether the MHRA covered the claims at issue). No MHRA claim is pending in this case. Therefore, by its plain language, the exclusivity provision does not apply here.

The third *Mangold* factor considers whether the Legislature, in partially regulating housing discrimination based on public assistance, indicated that it is a matter solely of state concern. *Minn. Chamber of Com.*, 944 N.W.2d at 449. When we analyzed the third *Mangold* factor in *Jennissen v. City of Bloomington* and *Minnesota Chamber of Commerce*, we looked to the plain language of the statute. *Jennissen v. City of Bloomington*, 913 N.W.2d 456, 462 (Minn. 2018); *Minn. Chamber of Com.*, 944 N.W.2d at 451. We do the same here. In doing so, we "require clear language expressing a legislative intent to exclude municipal activity." *Graco*, 937 N.W.2d at 765.

Fletcher asserts that there is no indication in the MHRA that the Legislature contemplated municipalities changing what constitutes discrimination. This statement misconstrues our inquiry under this factor. Courts look not for whether the Legislature expresses an intent to *include* municipal activity, rather, they look for whether the Legislature expresses an intent to *exclude* municipal activity. *Graco*, 937 N.W.2d at 765. We are not persuaded that the Legislature, in partially regulating housing discrimination based on public assistance, indicated that the subject matter is solely of state concern.

The fourth *Mangold* factor addresses whether housing discrimination based on public assistance is of such a nature that local regulation would have unreasonably adverse effects upon the general populace of Minnesota. *Minn. Chamber of Com.*, 944 N.W.2d at 452 (citing *Mangold*, 143 N.W.2d at 820).

33

Fletcher argues that the Ordinance creates a "problematic patchwork of differing discrimination definitions from city to city" and will lead to developers only constructing luxury rental units. Although Minneapolis landlords and developers may disfavor the Ordinance's requirements, the focus of *Mangold*'s fourth factor is whether the *state at large* would suffer because of local regulation. *Minn. Chamber of Com.*, 944 N.W.2d at 452. While differing local regulations may create difficulties for businesses, that fact does not automatically count as an unreasonably adverse effect on Minnesotans. *Graco*, 937 N.W.2d at 765–66; *see also Mangold*, 143 N.W.2d at 821 (concluding that a local regulation would not "have unreasonably adverse effects upon the general populace of the state" even though "the varied types of ordinances and, in some places, their absence, in the different communities in the Twin City metropolitan area have resulted in very unequal or spotty regulation"); *G.E.M. of St. Louis, Inc. v. City of Bloomington*, 144 N.W.2d 552, 554 (Minn. 1966). As we have previously explained, "if the Legislature determines that municipal regulation is creating economic confusion, the problem can be corrected by a clear expression of the legislative will." *Graco*, 937 N.W.2d at 766 (citation omitted) (internal quotation marks omitted). Therefore, this factor also weighs against field preemption.

The four *Mangold* factors analyzed here all counsel against finding the MHRA has preempted the relevant field such that the Ordinance is invalid. We therefore conclude that the MHRA does not occupy the field of housing discrimination based on public assistance, and it therefore does not preempt the Ordinance through field preemption.

**CONCLUSION**

For the foregoing reasons, we affirm the decision of the court of appeals.

Affirmed.


GAÏTAS, J., took no part in the consideration or decision of this case.